# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00591-CR

**Tyree Marquez Trader, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 264TH DISTRICT COURT OF BELL COUNTY
### NO. 79362, THE HONORABLE PAUL L. LEPAK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The State indicted Tyree Marquez Trader for aggravated sexual assault, and a jury acquitted him of that offense but convicted him of the lesser included offense of sexual assault. *See* Tex. Penal Code §§ 22.011, .021. The jury assessed punishment at 10 years' imprisonment, and the trial court entered a conforming judgment. In two appellate issues, Trader contends that the trial court abused its discretion by (1) excluding impeachment testimony that he argues would have shown that the complainant "had given a different story about what happened" from what she testified to and (2) admitting testimony about extraneous sexual assaults, over his objection under Rules of Evidence 404(b) and 403. We affirm.

## BACKGROUND

*Evidence of sexual assault of T.D.*

T.D., while 14 years old[1] in June 2017, was walking home through the neighborhood near her high school. Two black males drove up behind her, and the driver pointed a gun at her and told her to get in the car. She recognized the driver as Trader because she had seen him, and communicated with him, on Instagram. Afraid because of the gun, T.D. got in the back seat, and Trader drove the three a short distance to a wooded area with a walking trail.

Trader and the other male got out, and Trader, still holding the gun, told T.D. to get out too. He grabbed her shirt and told her to crawl through a nearby drainage tunnel. It led to a concrete enclosure with a cage-covered hole in the ceiling. Trader crawled to the enclosure with T.D. while the other male stayed outside. Trader, still holding the gun, told her to get on her knees and that if she got too loud, he would hurt her. He took off some of her clothes, exposed his penis, and told her "to start sucking on it." She complied because she was afraid.

He next told her to lie on the ground, pulled off her shorts and underwear, and "stuck his penis in [her] vagina." After he ejaculated, he ordered her to give him her phone, which she did; took some of her clothes out of her backpack; wiped his penis with them; and put them back. He said that if she told anyone, he would kill her.

After Trader left and had been gone for some time, T.D. exited back through the tunnel and went to the first house she saw. She knocked on the door and talked with the man who answered, asking if she could use his phone. The man was Brian Cox, and he and his wife helped T.D. call her grandmother and 911 because T.D. said that she had been raped in the area separating

---

[1] Because T.D. was a minor during the events underlying Trader's prosecution, we will protect her identity. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

2

Cox's part of the neighborhood from another across a creek. Patrol officers from the Killeen Police Department, paramedics, and T.D.'s grandmother soon arrived at the Coxes' home.

The paramedics took T.D. to a hospital for an examination by a Sexual Assault Nurse Examiner (SANE) a couple of hours later. The SANE who examined T.D. noted that she reported pain in her vaginal area at an 8 on a 1–10 scale and discovered a "pinpoint" injury below the vaginal opening. T.D. also had a linear abrasion on her right foot but no other injuries, which the SANE documented by writing "no acute trauma." The SANE took for DNA purposes several swabs from T.D.'s body, including from her vagina. The vaginal swab was later tested for DNA and contained a mixture from T.D. and two others. It was 2.54 octillion times more likely that the DNA mixture came from T.D., an unknown person, and Trader than if it had come from T.D. and two unknown people.

Trader was indicted for aggravated sexual assault[2] and proceeded to a jury trial. The State presented evidence through exhibits and the testimony of T.D., Cox, a patrol officer who responded to Cox's house, the SANE, a detective, and a DNA forensic scientist.

### Evidence of extraneous sexual assaults

The State also presented exhibits and testimony from four other witnesses regarding two other prior alleged sexual assaults by Trader. Trader objected under Rules of Evidence 404(b) and 403, but the trial court overruled the objections and explained its reasoning: "[T]he defensive theor[ies] of consent and fabrication have been raised," which the State may rebut under Rule 404(b), and "the similar nature of the facts as proffered by the State combined with the

---

[2] Despite T.D.'s age at the time of the sexual assault, the State did not allege in the indictment her age, that she was a child, or other similar descriptive information. Nor did it seek a conviction for sexual assault of a minor, perhaps because of Trader's own age. *See* Tex. Penal Code §§ 22.011(a)(2), (c)(1), (e)(2), 22.021(a)(1)(B), (2)(A)(ii), (iv), (b)(1).

fact[s] of the case" involving T.D. show that the extraneous assaults' "probative value substantially outweighs the risk of unfair prejudice in its presentation when coupled with a limine instruction," under Rule 403.

Lagaria Reed testified and explained that she first met Trader in March 2017. Upon meeting, Reed, Trader, and a friend of Trader's went to a motel room to smoke marijuana. Trader took Reed back to her home but texted her later in the day to invite her to smoke some more with him. When they met up again, Trader took Reed to pick up one of his friends, and Reed took some Xanax bars that Trader gave her. The three went to an unoccupied house, whose electricity Reed thought was not working, and Reed passed out, which surprised her because she did not think she was high enough for that. When she regained consciousness, she was bent over, and Trader was sexually assaulting her from behind. Another man was next to Trader, also with his pants down "like they were passing [Reed] back and forth." A vaginal swab taken from Reed during an examination at a hospital revealed the presence of semen and a mixture of DNA with both Trader and Reed as very likely the contributors.

U.T. also testified and explained that when she was 16 years old in 2015,[3] Trader sexually assaulted her. One day when she was walking near a high school—the same one, it turns out, that T.D. was walking near in June 2017—Trader walked up behind her. He grabbed her phone out of her hand, pulled her roughly by the arm across the street, and said that he would not give her phone back. He pulled her inside a shed in the backyard of a nearby home and said that for her to get her phone back, she would have to have sex with him. The home was unoccupied and in an area connected by the same walking trail that is near the Coxes' home.

---

[3] Because U.T. was a minor during these events, we will protect her identity. *See* Tex. R. App. P. 9.10(a)(3); *McClendon*, 643 S.W.2d at 936 n.1.

U.T. acquiesced to Trader's demand to get her phone back, and he took off her clothes and got on top of her. She changed her mind and told him several times to stop. But his penis still went inside her, and he covered her mouth. She pushed and scratched but could not stop him; he stopped only after ejaculating. A SANE at a hospital took swabs from U.T.'s underwear, which revealed that Trader was very likely a contributor to DNA found on the underwear.

### *Outcome of trial*

The jury acquitted Trader of aggravated sexual assault but convicted him of sexual assault. This appeal followed.

## DISCUSSION

### I.     No reversible abuse of discretion in exclusions of purported impeachment

In his first issue, Trader contends that the trial court abused its discretion by excluding impeachment testimony that he wished to elicit from Cox about whether T.D. "had given a different story about what happened" compared with her testimony. To analyze Trader's complaints about the testimony excluded, we must separate it from the testimony that came in without objection.

Trader's counsel cross-examined Cox about what T.D. said of her whereabouts and activities before arriving at his home. In that context, he asked Cox about "a party":

> Q. On June 23, 2017, did you receive any information from your personal knowledge of a party that was involved?
>
> A. Yes, sir.

The State did not object to this question or answer. Counsel then asked about drugs:

5

Q. On June 23, 2017, from your personal knowledge, did you have information of hearing about drugs or a person being drugged?

A. I believe so, yes.

Q. And that would be the person we are talking about, [T.D.], correct?

A. Yes, sir.

The State again did not object. Finally, counsel asked Cox about his pretrial talk with the prosecutor, and Cox confirmed that they "talked about [T.D.] talking about being a runaway." Again the State did not object. The jury thus had before it Cox's testimony that T.D. had given him "knowledge of a party that was involved," that she told him about either her ingestion of drugs or her having been drugged, and Cox's knowledge that T.D. was a runaway.

By contrast, the trial court excluded other testimony—the subjects of Trader's complaints. First, it sustained the State's relevance and hearsay objection to: "Mr. Cox, do you remember talking about hearing [T.D.] talk about a party around the area?" So although Cox's "knowledge of a party that was involved" came in without objection right after this sustained objection, whether T.D. "talk[ed] about a party around the area" was excluded.

Next, the trial court "sustain[ed] the objection," after the State articulated objections based on relevance, hearsay, improper impeachment, and lack of personal knowledge, to: "And were you clear or unclear whether [T.D.] meant the drugs were taken voluntarily or not voluntarily?"

Later when Trader's counsel asked, "Do you know whether [T.D.] was a runaway or not," the State objected on grounds of speculation and relevance, and outside the presence of the jury, the parties argued to the court at length and asked Cox questions on voir dire. During the lengthy argument and voir dire, the parties retread some ground that had already come into evidence without objection, specifically, Cox's knowledge of a party and T.D.'s voluntarily

6

ingesting drugs or having been drugged. But afterward, the trial court refocused on the pending question—whether Cox knew if T.D. was a runaway—and "sustain[ed] the objection to the last question asked." By that point, the State had articulated objections to other kinds of questions, but the objections to the runaway question remained speculation and relevance.

Finally, during the lengthy argument and voir dire, Trader's counsel asked to cross-examine Cox in front of the jury about whether T.D. had been at a party on the day in question. But he had not asked Cox that in the jury's presence. Nor did he ask it after the argument and voir dire, presumably because of the trial court's statements during and after the argument and voir dire.

In all then, there are four topics of potential testimony from Cox to which Trader's first appellate issue could apply—(1) whether Cox knew if T.D. was a runaway, (2) whether she "talk[ed] about a party around the area," (3) whether she had been at a party on the day in question, and (4) whether he was "clear or unclear whether she meant the drugs were taken voluntarily or not voluntarily." That Cox had "knowledge of a party that was involved" and that T.D. had voluntarily ingested drugs or had been drugged were otherwise before the jury without objection.

### A.    *Standard of review and applicable law*

We review a trial court's exclusion of evidence for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). A trial court abuses its discretion only if its decision lies outside the "zone of reasonable disagreement." *Id.* We must affirm the trial court on any legal theory supported by the record, even if the theory is not one on which the trial court itself relied. *See State v. Esparza*, 413 S.W.3d 81, 85 & n.17 (Tex. Crim. App. 2013); *Carrasco v. State*, 154 S.W.3d 127, 129 (Tex. Crim. App. 2005); *Miles v. State*, 488 S.W.2d 790, 792 (Tex. Crim. App. 1972). The trial court has broad discretion to limit the extent of cross-examination,

7

but it abuses its discretion when it prevents appropriate cross-examination. *See Carroll v. State*, 916 S.W.2d 494, 497–98 (Tex. Crim. App. 1996).

The appropriate methods of impeachment are (1) "impeachment by prior inconsistent statements (also known as self-contradiction)," (2) "impeachment by another witness," (3) "impeachment through bias or motive or interest," (4) "impeachment by highlighting testimonial defects," and (5) "impeachment by general credibility or lack of truthfulness." *See Michael v. State*, 235 S.W.3d 723, 725–26 (Tex. Crim. App. 2007). The first two methods are "specific," and "[s]pecific impeachment is an attack on the accuracy of the specific testimony (*i.e.*, the witness may normally be a truthteller, but she is wrong about X)." *Id.* The latter three methods are "non-specific," meaning that they are "an attack on the witness generally (the witness is a liar, therefore she is wrong about X)." *Id.*

The second method, also known as "impeachment by contradiction," "permits courts to admit extrinsic evidence that specific testimony is false, because contradicted by other evidence," including especially the testimony of another witness. *See Daggett v. State*, 187 S.W.3d 444, 453 n.24 (Tex. Crim. App. 2005) (quoting *United States v. Antonakeas*, 255 F.3d 714, 724 (9th Cir. 2001)); *accord* 1 McCormick on Evidence §§ 33, 45 (8th ed. 2020).

### B. Whether Cox knew if T.D. was a runaway

For the excluded testimony about whether Cox knew if T.D. was a runaway, we assume without deciding Cox would have answered the way Trader wanted and that the trial court abused its discretion by excluding the evidence. Even so, it is no grounds for reversal because substantially the same evidence came in elsewhere, including before Cox even testified. *See Womble v. State*, 618 S.W.2d 59, 62 (Tex. Crim. App. [Panel Op.] 1981) ("[R]eversal is not required by exclusion of evidence where the same testimony was later admitted without

objection."); *Guerra v. State*, 942 S.W.2d 28, 33 (Tex. App.—Corpus Christi–Edinburg 1996, pet. ref'd) ("[N]o harm results when evidence is excluded if other evidence of substantially the same nature is admitted." (citing *Womble*)).  During Trader's counsel's earlier cross-examination, T.D. disclosed that she was "a runaway" once the court overruled the State's objection to the question. Later, one of the patrol officers who first reported to Cox's house said that his partner told him that T.D. "was a runaway."  And earlier in his cross-examination testimony, Cox answered "I believe so" to a question about whether when he discussed the case with the prosecutor, the two "talk[ed] about [T.D.] talking about being a runaway."  Because substantially the same testimony came in from these sources, any abuse of discretion by excluding further testimony about whether Cox knew if T.D. was a runaway was not harmful.  *See Womble*, 618 S.W.2d at 62; *Guerra*, 942 S.W.2d at 33.

#### C.      Whether T.D. talked about a party "around the area" or went to a party

For both (a) the excluded testimony about T.D. talking about a party "around the area" and (b) the excluded topic of whether she had gone to a party that day, recall first that Cox's testimony about his "personal knowledge of a party that was involved" came into evidence without objection, right after the sustained objection to the "around the area" question and thus still within the context of what he had learned from T.D.[4]  We again assume that Cox would have answered the way Trader wanted and thus must decide whether the trial court abused its discretion by excluding either (a) the mere fact that any such party was "around the area" or (b) Cox's knowledge that T.D. went to any such party on that day.

_____

[4] The same context continued for two more questions and answers, in which Trader's counsel (i) asked Cox about "hearing about drugs or a person being drugged" and (ii) had Cox confirm that "the person we are talking about" was T.D.  (The State did not object to these questions and answers.)

Trader's theory of admissibility for this evidence is that he needed contradictory testimony from Cox to impeach T.D. She had testified that she did not go to a party and that she did not remember telling Cox about a party. It is thus no contradiction of her testimony whether any such party was "around the area"; Trader otherwise obtained the contradicting testimony he sought when Cox testified in the very next question and answer to "personal knowledge of a party that was involved." Relatedly, that same answer was given in the context of questions about what Cox had learned from T.D. Therefore, in context, the answer supplied the contradiction that Trader sought for T.D.'s testimony that she did not remember telling Cox about a party. It thus would have been within the "zone of reasonable disagreement" for the trial court to conclude that whether any party was "around the area" and that more evidence of whether T.D. went to any such party were not admissible as impeachment by contradiction. *See Michael*, 235 S.W.3d at 725–26; *Daggett*, 187 S.W.3d at 453 n.24; *see also Carroll*, 916 S.W.2d at 497–98 (trial court enjoys discretion to limit cross-examination "when a subject is exhausted").

### D.      *Whether Cox knew if T.D. had taken drugs voluntarily*

Similarly, for the excluded testimony about whether Cox was "clear or unclear whether [T.D.] meant the drugs were taken voluntarily or not voluntarily," we again see no abuse of discretion. T.D. had testified that she did not recall telling Cox that she had been at a friend's house where "there was drugs involved" and that "that, in fact," did not "happen." So when Trader's counsel later, without objection, elicited from Cox that "the person we are talking about" having given Cox "information of hearing about drugs or a person being drugged" was T.D., Trader thereby obtained the contradiction that he sought. Whether she had taken the drugs voluntarily or had been given them involuntarily would not have contradicted anything more in her testimony than what was already successfully contradicted because she had testified that she

10

had had no drugs *at all*. It thus would have been within the "zone of reasonable disagreement" for the trial court to conclude that any voluntariness or involuntariness in her ingesting drugs near in time to the aggravated sexual assault was not admissible as impeachment by contradiction.[5] *See Michael*, 235 S.W.3d at 725–26; *Daggett*, 187 S.W.3d at 453 n.24.

In sum, we hold that there was no reversible abuse of discretion in the trial court's exclusions of evidence about which Trader complains. We thus overrule his first issue.

## II.     No abuse of discretion in admission of extraneous sexual assaults

In his second issue, Trader contends that the trial court abused its discretion by overruling his objection and admitting evidence that he had sexually assaulted two other females, one a minor, before the events of this case. He objected under Rules of Evidence 404(b) and 403, and his counsel and the prosecutor argued the admissibility of the evidence to the trial court. After the parties' arguments, the court overruled Trader's objection, allowing the State to introduce the extraneous-offense evidence. The court explained why it overruled the objection under both Rules 404(b) and 403, giving the reasoning mentioned above.

### A.     *Standard of review and applicable law*

Like with a trial court's exclusion of evidence, we review a trial court's admission of evidence for an abuse of discretion. *Gonzalez*, 544 S.W.3d at 370. A trial court abuses its discretion only if its decision lies outside the "zone of reasonable disagreement." *Id.* We must affirm the trial court on any legal theory supported by the record, even if the theory is not one on which the trial court itself relied, *see Esparza*, 413 S.W.3d at 85 & n.17; *Carrasco*, 154 S.W.3d

---

[5] The State also lodged a hearsay objection to this evidence, which Trader acknowledges in his appellate brief. But his brief does not argue why the evidence was not hearsay, providing an independent reason for why we may not reverse the trial court over this exclusion of testimony.

11

at 129; *Miles*, 488 S.W.2d at 792, and "even if the trial judge gave the wrong reason for his right ruling," *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). Our review must focus on the record before the trial court when it admitted the evidence at issue. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); *Carrasco*, 154 S.W.3d at 129.

Evidence of a defendant's crimes, wrongs, or other acts is not admissible to prove the defendant's character to show that on a particular occasion the defendant acted in accordance with the character. Tex. R. Evid. 404(b)(1); *Gonzalez*, 544 S.W.3d at 370. But evidence of the defendant's crimes, wrongs, or other acts may be admissible if it has relevance apart from its tendency to prove character conformity. *Gonzalez*, 544 S.W.3d at 370–71. Such other relevant uses include proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Tex. R. Evid. 404(b)(2); *Gonzalez*, 544 S.W.3d at 371. These admissible uses "are neither mutually exclusive nor collectively exhaustive." *De La Paz*, 279 S.W.3d at 343. Thus, the party offering extraneous-offense evidence "need not 'stuff' a given set of facts into one of" Rule 404(b)(2)'s admissible uses, "but he must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than 'bad character' or propensity purpose." *Id.* But if the evidence is not relevant apart from supporting an inference of character conformity, "it is absolutely inadmissible under Rule 404(b)." *Gonzalez*, 544 S.W.3d at 371.

One admissible use of extraneous offenses arises when a defendant raises a defensive issue that negates an element of the offense. *De La Paz*, 279 S.W.3d at 343; *Martin*, 173 S.W.3d at 466. "Thus, a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact."

12

*Martin*, 173 S.W.3d at 466. "But a mere denial of commission of an offense generally does not open the door to extraneous offenses because . . . a defendant generally denies commission of the offense at trial—that is the reason for having a trial." *De La Paz*, 279 S.W.3d at 343 (internal quotation omitted). One element of the offense prosecuted here was lack of consent to the alleged sexual activity. *See* Tex. Penal Code §§ 22.011(a)(1)(A), (B), 22.021(a)(1)(A)(i), (ii).

Separately, if the probative value of relevant evidence is substantially outweighed by certain dangers, the evidence is inadmissible under Rule 403. *Gonzalez*, 544 S.W.3d at 371. Under that rule, a trial court may exclude evidence whose "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Unfair prejudice involves "an undue tendency to suggest an improper basis for reaching a decision," *Reese v. State*, 33 S.W.3d 238, 240 (Tex. Crim. App. 2000), and often involves decisions based on emotion, *see Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Gittens v. State*, 560 S.W.3d 725, 732 (Tex. App.—San Antonio 2018, pet. ref'd). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *accord Walter v. State*, 581 S.W.3d 957, 978 (Tex. App.—Eastland 2019, pet. ref'd).

Rule 403 calls for a balancing test, under which the analysis includes, but need not be limited to, (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it. *Colone v. State*, 573 S.W.3d 249, 266 (Tex. Crim. App. 2019); *Walter*, 581 S.W.3d at 978. Probative value is "the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—

13

coupled with the proponent's need for that item of evidence." *Davis*, 329 S.W.3d at 806. The balancing test "is always slanted" in favor of admissibility. *De La Paz*, 279 S.W.3d at 343.

### B.    *Rule 404(b)*

Here, the State had to prove lack of consent, and Trader's counsel's voir dire and cross-examinations showed that Trader disputed that element. Trader's counsel asked the venire panel, "How do we know if sex is consensual or not? How do we know? Anybody? Difficult question. Anybody?" He also raised that topic in the context of he-said-she-said disagreements: "But let's say their opinions are different. How do we figure it out? How do we make that determination?" He highlighted some of the panel's answers, including that consent could be determined from how the participants communicated or interacted before the sexual activity or from whether the participants knew each other. He concluded, "consensual is a very fine line and no does mean no but there's just—it's just a fine line" that requires "look[ing] at all the facts," "the case," "the dialogue," and "the people."

During the presentation of evidence, he cross-examined T.D. in several instances to elicit that she had talked to Trader over Instagram the day before the assault. He also elicited from her that prosecutors "told [her] what to say" when they met before trial.

When Cox testified, Trader's counsel elicited the information that there was "a party that was involved" and his "hearing" from T.D. "about drugs or a person being drugged." And he elicited that police appeared to be skeptical of T.D.'s statement.

With an officer who responded to Cox's home, Trader's counsel confirmed that the officer did not note any injuries, bruises, or markings on T.D.; no torn, pulled, or messy hair; and no torn, bloody, or marked clothing.

14

With the SANE, Trader's counsel highlighted how the SANE observed T.D. to be "calm, cooperative, [and] happy" despite having been sexually assaulted earlier in the day. He also confirmed her observations of (i) no other injuries on T.D. besides the pinpoint injury below the vaginal opening and the foot abrasion, including none indicative of sliding across or lying on a surface, and (ii) the SANE's note about "no acute trauma."

Finally, when cross-examining a detective, Trader's counsel revisited the Instagram messages, including some potentially on that day. He also drew the detective's attention to a statement by Cox that said that T.D. and Trader may actually have met that day at a friend's home and not on the road near the high school. And he emphasized that Trader, during his interview with a detective, showed no sign of any injuries.

From these examples of cross-examination and voir dire before the trial court made its admissibility ruling, we conclude that Trader contested the element of lack of consent beyond simply denying the commission of the offense so that the State could introduce relevant extraneous-offense evidence to rebut his theory of consent.[6] *See De La Paz*, 279 S.W.3d at 343 (more than "mere denial of commission of an offense" is required); *Martin*, 173 S.W.3d at 466 (relevant extraneous-offense evidence was admissible when consent was "hotly disputed"); *Grant v. State*, 475 S.W.3d 409, 417–18 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (defendant raised consent because "the gist of the cross-examination was that complainant was working as an escort when she went to the apartment and thus consented to the sexual encounter").

---

[6] Instances from after the trial court's ruling confirm our conclusion. Trader began his case-in-chief with his counsel's opening statement, declaring, "The evidence is going to show that the sexual acts between Mr. Trader and [T.D.] were consensual." His counsel also highlighted how T.D. did not mention to a forensic interviewer that Trader had a weapon during the assault. And with witnesses testifying about one of the extraneous assaults, Trader's counsel elicited that Trader has never been charged for it and that the victim once said that Trader "did not rape [her], it was consensual."

15

In such a situation, to be admissible, the State's extraneous-offense evidence to rebut consent must "show a *modus operandi* sufficiently distinctive to qualify as an exception to the general rule precluding the admission of extraneous-offense evidence." *See Martin*, 173 S.W.3d at 468; *accord De La Paz*, 279 S.W.3d at 347–48; *Grant*, 475 S.W.3d at 419. For *modus operandi* evidence, the extraneous and charged offenses must share sufficient similarities, but "[n]o rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008); *accord Martin*, 173 S.W.3d at 468. Even just "one unique characteristic" can supply sufficient similarity—for example, the use of "the same antique silver crossbow" across several robberies or a rapist–murderer's having left his DNA inside both of two victims at or near the time of each victim's death. *Segundo*, 270 S.W.3d at 8890. The shared similarities must be "something that sets [the extraneous offense] apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime." *Id.* at 89 n.26 (quoting *Ford v. State*, 484 S.W.2d 727, 730 (Tex. Crim. App. 1972)).

Here, the record from before the trial court's admissibility ruling included the State's proffer about the extraneous sexual assaults of Reed and U.T., from which the court reasonably could have concluded that the extraneous assaults bore sufficient similarities to that of T.D. With both Reed and T.D., the assault happened when the victims were only "passing acquaintance[s]" with Trader. With both, the assault happened in an enclosed place with no one else around save for one friend of Trader's. Finally, Trader ejaculated in both victims, leaving DNA evidence.

16

With both U.T. and T.D., the victim was a minor. With both, the assault happened in a secluded place in a neighborhood. In fact, both secluded places were in areas connected by the same walking trail. Trader assaulted both victims after coming upon them while they were walking through the neighborhood. He took both victims' phones. And again, Trader ejaculated in both victims, leaving DNA evidence.

Trader argues that each of the Reed and U.T. assaults are not sufficiently similar to that of T.D. because Reed was not a minor, went willingly with Trader and his friend, and passed out from having taken drugs. He also says that U.T., then 16 years old, was older than T.D., then 14, and that U.T. was manhandled into a shed with no weapon present while T.D. was threatened with a gun to get into a car.

We are not persuaded because we think it "at least subject to reasonable disagreement," *see De La Paz*, 279 S.W.3d at 348, that there were sufficient similarities between each of the Reed and U.T. assaults and T.D.'s case. Each pair, Reed–T.D. and U.T.–T.D., involved "striking and unusual" shared features. *See Grant*, 475 S.W.3d at 420. Trader assaulted both Reed and T.D. although he only knew them in passing. And he assaulted each of them in an enclosure where only he, one friend, and the victim were present. As for U.T., Trader assaulted both her and T.D. in the same walking-trail-connected neighborhood after coming upon each victim while they were walking through the neighborhood. He also took both victims' phones close in time to assaulting them. The record before the trial court thus allowed it reasonably to conclude that the extraneous assaults shared sufficient similarities with that of T.D. so that they were admissible. *See Segundo*, 270 S.W.3d at 88; *Martin*, 173 S.W.3d at 468; *Grant*, 475 S.W.3d at 417–20.

17

### C.     Rule 403

Even if admissible under Rule 404(b), the extraneous assaults still should have been excluded if they failed a Rule 403 balancing.  *See Gonzalez*, 544 S.W.3d at 371.  We review Trader's arguments under the standard Rule 403 factors: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for it.  *See Colone*, 573 S.W.3d at 266; *Walter*, 581 S.W.3d at 978.

The evidence of the extraneous assaults was highly probative because they contained sufficient similarities with the assault of T.D., suggesting that Trader committed all three without consent.  *See De La Paz*, 279 S.W.3d at 348 (evidence that defendant repeated acts sharing "unlikely coincidences" "would allow jurors to conclude that it is objectively unlikely that" charged false statement made by defendant in police report was not merely repeated coincidence but was instead false statement made knowingly).  The first factor therefore favors admissibility.

As for the potential to impress the jury in an irrational, indelible way, the evidence of each extraneous assault was no more inflammatory than, or fundamentally different in character from, the charged assault.  *See, e.g.*, *Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) (observing that "the first murder, being no more heinous than the second, was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose"); *see Regan v. State*, 7 S.W.3d 813, 818 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (concluding that evidence of extraneous robbery that made defendant's identity as perpetrator of charged robbery more probable because of shared *modus operandi* "did not have the potential to impress the jury in an irrational way").  We can say

18

this with some confidence because of the trial court's limiting instruction. Before the evidence of

the extraneous assaults came in, the trial court instructed the jury:

> So ladies and gentlemen, under the Texas Rules of Evidence[,] evidence of a crime or wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with that character. It may, however, be admissible for another purpose, such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake[,] or lack of accident.
>
> If in this case you hear evidence or testimony that the defendant, Mr. Trader, committed an offense other than what is alleged against him in the indictment, you cannot consider that evidence for any purpose unless first you find it to be true beyond a reasonable doubt. And even if that is true, only for motive, opportunity, intent, preparation[,] or similar type purposes and not for the purpose of determining that on a particular date, he acted in conformity with any character trait.

We assume that the jury followed these instructions. *See Hammer v. State*, 296 S.W.3d 555, 568

n.40 (Tex. Crim. App. 2009) ("If there is any doubt about the existence of unfair prejudice,

confusion of the issues, misleading, undue delay or waste of time, it is generally better practice to

admit the evidence taking necessary precautions by way of contemporaneous instructions to the

jury followed by additional admonitions in the charge."); *Harris v. State*, 572 S.W.3d 325, 334–

35 (Tex. App.—Austin 2019, no pet.) (upholding admission of extraneous act in part because trial

court provided jury with limiting instruction that "minimized any risk that the jury would consider

the substance of [the prosecutor's] questioning for any improper purpose or give it undue

weight" and because of presumption that jury follows trial court's instructions, absent evidence

to the contrary). On the other hand, at least some indelible prejudice stemmed from the State's

introduction of two extraneous assaults rather than just one. *See, e.g.*, *Sattiewhite v. State*,

786 S.W.2d 271, 285 (Tex. Crim. App. 1989) ("Prejudice is inherent in the use of extraneous

offenses."); *Templin v. State*, 711 S.W.2d 30, 32 (Tex. Crim. App. 1986) ("[Extraneous-offense]

19

evidence carries with it the danger that a defendant in a criminal action may be convicted of an implied charge of having a propensity to commit crimes generally rather than the specific offense for which he is on trial."). The second factor only slightly favors admissibility.

For the time needed to develop the evidence, the State's proffer did not reveal how long presenting the extraneous-offense evidence would take. This factor is therefore neutral.[7]

As for the State's need for the evidence, we note that the State had to prove T.D.'s lack of consent as an element of the charged offense and thus that the State's need for probative evidence of lack of consent was great. Further, Trader affirmatively contested consent, as mentioned above, thereby highlighting the State's need for evidence probative of lack of consent. The extraneous assaults helped prove T.D.'s lack of consent because of the decreasing likelihood of consensual sexual encounters involving Trader given the evidence of nonconsensual ones, rebutting his defense that the T.D. encounter was consensual. *See De La Paz*, 279 S.W.3d at 348; *Grant*, 475 S.W.3d at 417–20. The State thus needed evidence of the extraneous assaults in the face of Trader's defense, so the fourth factor favors admissibility.

Considering these factors—three favoring admissibility and the fourth neutral—the trial court reasonably could have concluded that the danger from admitting the extraneous assaults did not substantially outweigh their probative value. *See* Tex. R. Evid. 403; *Davis*, 329 S.W.3d at 806; *Walter*, 581 S.W.3d at 978. The trial court thus did not abuse its discretion by admitting the evidence over the Rule 403 objection. We overrule Trader's second issue.

---

[7] As it turned out, the evidence did not take an "inordinate" amount of time for this case. *See Caston v. State*, 549 S.W.3d 601, 613 (Tex. App.—Houston [1st Dist.] 2017, no pet.). The State called four witnesses—Reed, U.T., a detective, and a patrol officer—whose testimony concerned only the extraneous assaults. Considering all the pages of the reporter's record that involved the prosecutors' questioning of State's witnesses about the assault of T.D. compared to all the pages of the prosecutors' questioning of the four witnesses testifying about the extraneous assaults, it took the State roughly one-fourth of its case to put on the extraneous evidence.

20

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Baker and Kelly

Affirmed

Filed:   June 29, 2021

Do Not Publish